ACME VALVE & FITTINGS COM-
PANY, Plaintiff,

v.

Edward WAYNE, d/b/a Gibraltar,
Ltd., Defendant.

Civ. A. No. 72–H–1194.

United States District Court,
S. D. Texas,
Houston Division.

July 9, 1974.

Wilson & Guest, William F. Guest, Houston, Tex., Mason, Kolehmainen, Rathburn & Wyss, Clemens Hufmann, Chicago, Ill., for plaintiff.

Pravel, Wilson & Matthews, B. R. Pravel and John H. Dodge, II, Houston, Tex., for defendant.

## MEMORANDUM OPINION & ORDER

SEALS, District Judge.

Plaintiff has brought this suit seeking to establish himself as the lawful owner of the trademark "OIC" and the trademark "OIC and Design," and Defendant has counterclaimed maintaining that he is in fact the owner of the trademarks. This suit involves questions of the exclusive right, title and interest in and to the trademarks "OIC" and "OIC and Design," infringement and unfair competition. Each party maintains that it has the exclusive right to use the designated trademarks on industrial valves which it sells in interstate commerce, and each party therefore claims that the other party is infringing its right to these "OIC" marks. Jurisdiction is based on

the Trademark Laws, 15 U.S.C. §§ 1119, 1120 and 1121 and 28 U.S.C. §§ 1331, 1332 and 2201. Trial was held to the Court, after which both parties filed proposed findings of fact and conclusions of law and briefs in support thereof. This Memorandum Opinion will constitute the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

A short discussion of the history of the trademarks involved is helpful in understanding the posture of the case as it appears before the Court at this time. Major valve manufacturers in the United States have long made it a general practice to use their names or abbreviations of their names as trademarks for their valves. These marks are usually a part of the metal casting of the valves, and customers often order valves specifying the manufacturer's name. The "OIC" trademarks involved in this suit were for many years used on valves manufactured by the Ohio Injector Company of Wadsworth, Ohio. This company was one of the major United States manufacturers of industrial valves and used the "OIC" trademarks on valves made of bronze, steel and iron. The trademark letters appeared in elevation on the housings of valves made by this corporation, and they also appeared on washers located in the center of the valve handles. These valves were sold all over the United States and were used by refineries in processing and transporting petroleum and other fluids. "OIC" valves enjoyed a good reputation and were advertised in catalogs and trade periodicals.

On January 17, 1931 Ohio Injector Company filed two applications for registration of the mark "OIC" in the Patent Office. These applications matured into Registrations No. 283,154 for "OIC and Design" and No. 283,155 for "OIC" on May 19, 1931. The registrations remained in effect until August 19, 1971 when they expired according to 15 U.S. C. § 1059 because no renewal applications were filed.

In November, 1966 all shares of stock of the Ohio Injector Company were ac-quired by Kearney of Ohio, a subsidiary of Kearney-National, Inc. In June, 1967 the Ohio Injector Company changed its name to the OIC Corporation. Then in the fall of 1969, Kearney-National sold the majority of the assets of OIC Corporation to Conval Corporation. At that time the OIC Corporation discontinued the manufacture of valves in commercial quantities. The sale included substantially the entire inventory of the steel valves which OIC Corporation had on hand at that time, but did not transfer any trademark rights. Conval Corporation manufactures valves but at no time have they sold them under the "OIC" trademark. On December 31, 1971 OIC Corporation filed a certificate of dissolution with the Secretary of State at Columbus, Ohio.

Both Plaintiff and Defendant are engaged in the business of buying and selling new and used valves and both are separate entities from the OIC Corporation, Kearney-National and Conval Corporations. Plaintiff has engaged in this business for forty years; the Defendant for twenty-five. Both have during this time bought and sold new and used OIC valves as have their competitors. In addition Defendant, in January of 1970, obtained valve patterns from Kerotest Corporation, a United States manufacturer of valves, which he turned over to Mr. L. Iturate of Spain to use in manufacturing valves for the Defendant to market in the United States and overseas.

With the above background information we now turn to the real question at hand, that is, who is the present owner of the trademarks "OIC" and "OIC and Design." Determination of all other issues follows the decision as to ownership. The Plaintiff traces his claim to ownership of the marks to a purchase made by him on January 20, 1970 from Kearney-National, Inc. of the entire inventory of finished bronze valves as evidenced by Purchase Order No. 687 which reads:

"For the following consideration $350,000 Acme Valve and Fittings

Corp. is purchasing from Kearney-National all the Finished Bronze Valves on the inventory Stock Status Sheets dated 1–15–70, as amended to date, subject to a physical inventory verifying these amounts. Acme Valve is also purchasing all patterns, core boxes and drawings owned by Kearney-National Inc. and/or OIC and utilized in the manufacture of the above Bronze Valves.

Acme Valve & Fittings is also acquiring the use of OIC name and all trademarks in connection with that name and in connection with the manufacture and sale of these bonze valves."

Plaintiff further claims that he owns the "OIC" marks regardless of the interpretation of Purchase Order No. 687 through his independent usage of the mark.

The Defendant takes the position that the "OIC" marks were abandoned as evidenced by the sale of the entire valve inventories and by permitting the trademark registrations to expire, and that this abandonment left the marks open for adoption by others. This the Defendant did by filing a lawful registration, and manufacturing using that trademark. The Defendant maintains that Purchase Order 687 was not an assignment of the trademarks but was at most a license and as such was ineffective in that it lacked provisions for quality control and the placement of the mark. In addition, the Defendant argues that Plaintiff has no independent rights to the mark through usage because he has failed to identify his name with the marks or use them in any way as his own.

■ Trademark rights can be acquired in two ways: by getting ownership or title to another's trademark rights, or by the proper usage of a trademark associating or identifying the user as the owner of the work or the source of the product. Coca-Cola Bottling Co. v. Coca-Cola Co., 269 F. 796 (D.C.Del.1920); Wallace Torres Corp. v. Sutton Cosmetics (P.R.) Inc., 175 U.S. P.Q. 488 (1972).

■ In order for a transfer of rights in a trademark to constitute a sale or assignment, thereby vesting title to the trademark in a party, the transfer must be absolute and must relate to the entire rights in the trademark. In contrast to an assignment, a license to use a mark does not pass title to the trademark because it is a transfer of limited rights, less than the whole interest which might have been transferred. Jones v. Pepsi-Cola Company, 223 F. Supp. 650, 653 (D.C.Neb.1963); Armour et al. v. Commissioner of Internal Revenue, 101 U.S.P.Q. 257 (U.S.T.C.1954).

Having considered the testimony at trial carefully, along with all the documents entered into evidence and the briefs, the Court is convinced that Purchase Order 687, on which Plaintiff bases one of its claims to the "OIC" trademarks, means exactly what it says on its face and nothing more. Purchase Order 687 gave the Plaintiff the use of the "OIC" trademark and then only in relation to bronze valves even though the OIC Corporation had manufactured and held patents to steel valves and cast iron valves as well. The Purchase Order did not transfer any exclusive right, title or interest to the marks. Clearly, Kearney-National, who still held the "OIC" marks although many of the assets of the OIC Corporation had been sold to Conval, could have transferred as of January 20, 1970 the exclusive right, title and interest in the "OIC" marks for all valves to the Plaintiff or anyone else, but they did not. They only transferred the right to use the "OIC" trademarks with relation to bronze valves, and this transfer was substantially less than what they held. The only evidence to the contrary, that is that Purchase Order 687 was intended to transfer all interest in the "OIC" marks, is the uncorroborated testimony of Plaintiff's Vice-President. However, the Court cannot give this evidence much weight in light of the witness' interest in establishing his rights to the marks.

There is no evidence that subsequent to the January 20, 1970 Purchase Order Kearney transferred the rights to the trademarks to anyone, prior to their expiration on August 19, 1971. Furthermore, there is no evidence to indicate that Plaintiff made any attempt to obtain a transfer of the United States Trademark registrations 283,155 and 283,154 from Kearney-National to themselves although the registrations were in full force on January 20, 1970 when the Purchase Order 687 was executed. Nor did Plaintiff file an application in the United States Patent Office to register the "OIC" marks as its trademarks after the registrations expired on August 19, 1971 or at any other time.

In addition, the Vice-President of Plaintiff admitted that Plaintiff received under Purchase Order 687 patterns and molds for bronze valves only, and such patterns and molds were not suitable for manufacturing steel or iron valves. Plaintiff at no time was transferred the entire assets of the old OIC Corporation for manufacturing all types of valves but instead was expressly limited to the equipment for manufacturing bronze valves, which was less than all of the rights which Kearney-National, as owners of the OIC Corporation had at the time of Purchase Order 687.

The fact, as has been noted before, that the common practice among valve manufacturers in the United States to use the same trademark for all metal valves indicates to the Court, contrary to Plaintiff's position, that the Purchase Order would not have been limited to "bronze valves" as stated three times in the order unless the parties expressly intended such a limitation.[1]

From the credible testimony heard at the trial it is apparent to this Court that at no time did the Plaintiff send out any notices, or advertisements, or in any other way call the attention of the public to the fact that he claimed to be the owner of the "OIC" marks nor did he ever notify the public that valves marked "OIC" were coming from anyone other than the original manufacturer, the OIC Corporation.

At no time has the Plaintiff had its own manufacturing facilities to manufacture valves and no credible evidence has been brought before this Court to indicate that Plaintiff has ever had any valves manufactured subsequent to the January 20, 1970 Purchase Order utilizing the "OIC" trademarks that it then sold to third parties. Equally apparent from the evidence is that since the January 20, 1970 Purchase Order 687 Plaintiff has not made any changes in its previous manner of doing business with respect to "OIC" valves. Prior to that date Plaintiff was a wholesaler or retailer of valves, dealing in new surplus and used valves with the mark "OIC" on them, and the purchasers understood that Plaintiff did not represent itself to be the manufacturer or the origin of such valves. The trade understood such mark to indicate that the OIC Corporation was the manufacturer of the valves. After January 20, 1970 the Plaintiff continued to act as a wholesaler or retailer of the valves and there was no association of the Plaintiff's company name with the "OIC" mark to thereby indicate the Plaintiff as the manufacturer or origin of such valves.

■ In short, the Court is convinced that Purchase Order 687 failed to transfer exclusive ownership rights to the OIC trademarks and thus Plaintiff's claim to the marks based on the order must fail. At best Purchase Order 687 might be construed as granting to Plaintiff a license to use the "OIC" mark on bronze valves, but since there is no provision for quality control with respect to the manufacture of valves pursuant to the license by the OIC Corporation or its successor the purported license was void

---

1. It is apparent because of this custom in the valve industry of the manufacturer using the same mark for all metal valves, that to split the "OIC" marks between bronze, steel and iron allowing different manufacturers to produce each would only tend to cause confusion with respect to the mark.

and ineffective to transfer any rights as a matter of law, the same being against public policy. Heaton Distributing Co. v. Union Tank Co., 387 F.2d 477 (8th Cir. 1967); Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2 Cir. 1959).

Having concluded that the Plaintiff did not obtain the title or ownership of the "OIC" marks from their original owner, the Court will now turn to the Plaintiff's claim that irrespective of Purchase Order 687 it has acquired rights to the "OIC" trademarks through the independent usage of the marks as its own trademarks. This is the same theory upon which the Defendant bases his claim to the marks. The fact that either Plaintiff or Defendant has independent rights to the "OIC" marks is premised on the assumption that the OIC Corporation or its subsequent owner, Kearney-National, no longer have any rights to the marks; that they have abandoned them.

■■ Certainly an abandoned trademark is fair game for any merchant or manufacturer who seeks to use it, and when several do so then the determination of who is ultimately entitled to the rights is governed by the priority of usage test. P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc., 462 F.2d 134 (2d Cir. 1972). The circumstances from which abandonment of a trademark can be inferred have been succinctly stated in Sheila's Shine Products, Inc. v. Sheila Shine, 486 F.2d 114 (5th Cir. 1973):

> The actual cessation of an established business plus an intent to abandon it is sufficient to constitute abandonment and concomitant loss of rights in a trademark. Intention to abandon a trademark may be inferred from the facts surrounding physical abandonment. (citations omitted).

As previously noted, the OIC Corporation discontinued the manufacture of valves in commercial quantities in 1969, and subsequently Kearney-National, the owner of OIC Company, sold substantially all of the inventory of "OIC" valves on hand to Conval Corporation and to the Plaintiff. Then Kearney-National, which still held the trademark rights as a result of its ownership of the OIC Corporation, failed to renew the registrations of the marks in August, 1971. From this series of events, the Court concludes that the owners of the "OIC" marks did in fact by August, 1971 abandon them, and intended to abandon them, and that at this point the marks were available for others to use. This conclusion is reinforced by the fact that the OIC Corporation filed a certificate of dissolution with the Secretary of State of Ohio on December 31, 1971. Furthermore, there is no evidence to indicate that Kearney-National has made any use or attempted to make any use of the marks since the expiration of the registrations, or did they file any opposition in the Federal Trademark Office at the time Defendant filed his registrations for the "OIC" marks.[2]

The Plaintiff argues that Defendant acknowledged his ownership of the mark by proposing to him a joint venture utilizing the "OIC" marks in the manufacture of valves and in seeking permission from Plaintiff to distribute some valves in the United States which Defendant had manufactured in Spain which carried the trademark "OIC" and underneath it the name of Defendant's company, that is, Gibralter, Ltd., and the country of origin. However, the Court accepts the Defendant's version of the facts as true; that is, Defendant did think Plaintiff had the "OIC" marks at the time he proposed the venture, and sought approval on the distribution of the valves, but that he became suspicious when Plaintiff refused his offer of $40,000 for the "OIC" marks and decid-

---

2. Significantly, the trademark registration statute provides specifically that no trademark is to be registered which "so resembles a mark registered in the Patent Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive . . ." 15 U.S.C. § 1052(d).

ed to have an independent search made in the United States Patent Office, which established that the marks were still registered to the OIC Corporation and not to Plaintiff. When such registrations expired on August 19, 1971, Defendant immediately began the sale of the valves he had manufactured in Spain, his first sale being in Louisiana about September 1, 1971. Defendant has continued since that time to have steel and iron valves manufactured in Spain bearing the "OIC" marks and they have been sold in commerce with tags showing "OIC" in close association with Defendant's company name, Gibralter, Ltd. On September 4, 1971 Defendant filed applications for trademark registrations for "OIC" and "OIC and Design," and those were granted as Registrations Nos. 941,827 and 937,395 on August 29, 1972 and July 11, 1972.

The Plaintiff at trial offered testimony that it had manufactured in 1970 bronze valves using the patterns, core boxes and "OIC" trademarks which were the subject of Purchase Order 687 in order to show it had acquired all rights to the "OIC" trademarks through Purchase Order 687. In his post trial briefs, Plaintiff argues that this testimony establishes that Plaintiff acquired common law rights to the "OIC" marks prior to any usage of them by Defendant. The evidence offered by Plaintiff consisted of the testimony of the company's Vice-President, Mr. Graff, that he had placed an order with Conval Corporation to manufacture the bronze valves for them and that they had done so. Conval Corporation was also storing the bronze valve inventory that Plaintiff had purchased from the OIC Corporation as reflected by Purchase Order 687, and Plaintiff was filling orders it received for those valves by having them shipped directly from the inventory at Conval. Sometime later, according to the testimony of Plaintiff's Vice-President, Plaintiff requested Conval to account for the valves in the inventory, and when the accounting came up short, an agreement was arranged whereby Conval

would substitute the valves it had manufactured in place of the ones missing and would not charge Plaintiff for manufacturing them. This testimony is the only evidence introduced with reference to Plaintiff's having used or manufactured under the trademarks; there are no supporting documents or corroborating testimony. In light of the interest of this witness in the outcome of the case, as the Court has noted previously, this evidence without more is simply insufficient to convince this Court that Plaintiff has established any common law rights to the "OIC" marks.

The Court is mindful that each trademark case must be decided upon its own facts. American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963). In this case, because both sides had at all times been dealers or wholesalers, in order to perfect common law trademark rights through usage in the "OIC" marks it was incumbent that there be an identification or association of that person as the new supplier or owner of the mark. La Maur v. Block, 176 U.S.P.Q. 218 (1972). In this case Plaintiff itself at no time manufactured any valves, but only sold an inventory of valves from a source other than Plaintiff. As pointed out in Wallace Torres Corp. v. Sutton Cosmetics, supra:

> The use of the trademark should be made in the person's own name, that is, in the name of the person who puts the product on the market. Therefore, the use by wholesalers or jobbers is not a source of rights. To purchase an inventory of a product is not a source of right either. The use of the product on the market, identified with the person who puts it on the market is what establishes the right to the trademark. The one who buys an inventory is not in a better position than a retailer, a wholesaler, or a distributor (citations omitted).

The Defendant, as noted before, has manufactured using the "OIC" mark, showing a clear association and an identification of Gibraltar Limited

(Defendant's company) with the "OIC" marks. When a trademark is abandoned, such as in this case, it may be acquired by a new person, provided that it has ceased from being identified with its former owner, and the new person cannot make himself pass for a successor of the former owner. *Wallace Torres*, supra. From the evidence, especially Defendant's exhibits 6, 7, 20 and 21 it is readily apparent that Defendant at all times identified himself (through Gibraltar, Ltd.) with the "OIC" marks in such a manner as to make it clear that he was a different owner from the old Ohio Injector Corp. The Plaintiff on the other hand has made no overt acts to distinguish it from the old company. Thus, it is the opinion of this Court that Defendant was prior in usage of the marks and has thus perfected his common law rights to those marks.

■■■■■ Furthermore, the Court is of the opinion that Defendant validly and honestly obtained the registrations to the trademarks at issue. The Plaintiff argues that Defendant procured the registrations by false and fraudulent declaration in that he stated in his application that he had used the marks in interstate commerce, when he had not, and when he stated "to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce" when in fact he knew Plaintiff owned marks. However, the evidence simply does not support this allegation. In order for statements to be false or fraudulent it must be shown that the declarant knew they were false at the time he made them. De Mert & Dougherty v. Chesebrough-Pond's, Inc., 348 F.Supp. 1194 (D.Ill.1972). A trademark on goods is considered to be used in commerce when it is placed on the goods or containers in any manner and the goods are then sold or transported in commerce. 15 U.S.C. § 1127. This requirement has been interpreted by the courts

to mean that the sale appears to be more than a sham, that the use be a bona fide business transaction. *De Mert & Dougherty*, supra. The evidence indicates that subsequent to the expiration of the old registration and prior to applying for the new registrations Defendant made a sale in Louisiana of valves he had manufactured in Spain bearing the "OIC" mark in close association with Gibraltar, Ltd. The Court is of the opinion this interstate shipment pursuant to the sale was in the ordinary course of business, and not a sham, and is sufficient upon which to predicate a claim on the trademark registrations of use in interstate commerce.

■■■ In addition, the Court is convinced that Defendant's statement that no one else was entitled to the marks was not false because Defendant acted in good faith in making that statement. Defendant, on the basis of Plaintiff's actions discussed earlier, which actions caused him to doubt that Plaintiff owned the "OIC" marks, had caused a thorough search to be made. This search showed the marks to be expired and showed no ownership of them by Plaintiff. Thus, the registrations were not procured by false and fraudulent statements which would render said registrations invalid.

It is therefore the conclusion of this Court that Defendant's registrations are valid and that Defendant is entitled to exclusive use of the registered "OIC" marks in commerce on valves of iron, steel and bronze, and the Defendant is entitled to a permanent injunction against the further use of the "OIC" trademarks by Plaintiff under 15 U.S.C. § 1116. Since the evidence has established that Plaintiff did not ever use the "OIC" trademarks as its own,[3] there does not appear to be any present basis for damages against Plaintiff.

Each party will bear its own costs.

The Defendant will prepare a judgment consistent with this Memorandum

3. The testimony indicated Plaintiff intended to utilize the marks but had not due to the pendency of this lawsuit.

Opinion and Order and after submitting it to Plaintiff for approval as to form, will file it with the Court within ten (10) days of the filing of this Memorandum Opinion and Order.

The Clerk will enter this Memorandum Opinion and Order and provide counsel with true copies.