INDIANAPOLIS COLTS, INC., National Football League Properties, Inc., and National Football League, Plaintiffs–Appellees,

v.

METROPOLITAN BALTIMORE FOOT-BALL CLUB LIMITED PARTNER-SHIP, James L. Speros, and Canadian Football League, Defendants–Appellants.

No. 94–2578.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 3, 1994.

Decided Aug. 12, 1994. *

Daniel C. Emerson, Bose, McKinney & Evans, Indianapolis, IN, Nadine P. Flynn, John P. Reiner, Robert L. Raskopf, Townley & Updike, New York City, for Indianapolis

---

* The decision was released in typescript because of the desire of the new Baltimore Canadian Football League team (the appellant) to know as soon as possible what name it can play under and license merchandise under.

Colts, Inc., National Football League Properties, Inc., National Football League.

Stanley C. Fickle, Robert P. Johnstone, Michael Rosiello, Barnes & Thornburg, Indianapolis, IN, George F. Pappas, David J. Heubeck, Mitchell Y. Mirviss, Vicki Margolis, Kenneth C. Bass, III, Venable, Baetjer & Howard, Baltimore, MD, for Metro. Baltimore Football Club Ltd. Partnership, James L. Speros, Canadian Football League.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

The Indianapolis Colts and the National Football League, to which the Colts belong, brought suit for trademark infringement (15 U.S.C. §§ 1051 et seq.) against the Canadian Football League's new team in Baltimore, which wants to call itself the "Baltimore CFL Colts." (Four of the Canadian Football League's teams are American.) The plaintiffs obtained a preliminary injunction against the new team's using the name "Colts," or "Baltimore Colts," or "Baltimore CFL Colts," in connection with the playing of professional football, the broadcast of football games, or the sale of merchandise to football fans and other buyers. The ground for the injunction was that consumers of "Baltimore CFL Colts" merchandise are likely to think, mistakenly, that the new Baltimore team is an NFL team related in some fashion to the Indianapolis Colts, formerly the Baltimore Colts. From the order granting the injunction the new team and its owners appeal to us under 28 U.S.C. § 1292(a)(1). Since the injunction was granted, the new team has played its first two games—without a name.

A bit of history is necessary to frame the dispute. In 1952, the National Football League permitted one of its teams, the Dallas Texans, which was bankrupt, to move to Baltimore, where it was renamed the "Baltimore Colts." Under that name it became one of the most illustrious teams in the history of professional football. In 1984, the team's owner, with the permission of the NFL, moved the team to Indianapolis, and it was renamed the "Indianapolis Colts." The move, sudden and secretive, outraged the citizens of Baltimore. The city instituted litigation in a futile effort to get the team back—even tried, unsuccessfully, to get the team back by condemnation under the city's power of eminent domain—and the Colts brought a countersuit that also failed. *Indianapolis Colts v. Mayor & City Council of Baltimore*, 733 F.2d 484, 741 F.2d 954 (1984), 775 F.2d 177 (7th Cir.1985).

Nine years later, the Canadian Football League granted a franchise for a Baltimore team. Baltimoreans clamored for naming the new team the "Baltimore Colts." And so it was named—until the NFL got wind of the name and threatened legal action. The name was then changed to "Baltimore CFL Colts" and publicity launched, merchandise licensed, and other steps taken in preparation for the commencement of play this summer.

The defendants do not argue that the balance of irreparable harm is so one-sided against them that the preliminary injunction should not have been issued even if the plaintiffs have the stronger legal position. *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir.1994). They stand foursquare on the contention that the district judge committed serious legal errors. The first they say was in holding that the Baltimore team is within the reach of Indiana's long-arm statute which is applicable to this suit by virtue of Fed.R.Civ.P. 4(k)(1)(A). The only activity of the team undertaken or planned so far in Indiana is the broadcast of its games nationwide on cable television. Since the Indiana statute reaches as far as the U.S. Constitution permits, Ind.R.Trial Pro. 4.4, we need decide only whether the due process clause of the Fourteenth Amendment forbids the degree of extraterritoriality entailed by this lawsuit. We think not, and are not even certain that the broadcasts in Indiana are critical. The Indianapolis Colts use the trademarks they seek to defend in this suit mainly in Indiana. If the trademarks are impaired, as the suit alleges, the injury will be felt mainly in Indiana. By choosing a name that might be found to be confusingly similar to that of the Indianapolis Colts, the defendants assumed the risk of injuring valuable property located in Indiana. Since there can be no tort without an injury, *Mid-*

*west Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 524 (7th Cir.1993), the state in which the injury occurs is the state in which the tort occurs, and someone who commits a tort in Indiana should, one might suppose, be amenable to suit there. This conclusion is supported by the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), holding that the state in which the victim of the defendant's defamation lived had jurisdiction over the victim's defamation suit.

We need not rest on so austere a conception of the basis of personal jurisdiction. In *Calder* as in all the other cases that have come to our attention in which jurisdiction over a suit involving intellectual property (when broadly defined to include reputation, so that it includes *Calder* itself) was upheld, the defendant had done more than brought about an injury to an interest located in a particular state. The defendant had also "entered" the state in some fashion, as by the sale (in *Calder* ) of the magazine containing the defamatory material. Well, we have that here too, because of the broadcasts, so we needn't decide whether the addition is indispensable. The bulk of the Indianapolis Colts' most loyal fans are, no doubt, Hoosiers, so that the largest concentration of consumers likely to be confused by broadcasts implying some affiliation between the Indianapolis Colts and the Baltimore team is in Indiana. It is true that the defendants have not yet licensed the sale of merchandise with the name "Baltimore CFL Colts" on it in Indiana, but citizens of Indiana buy merchandise in other states as well. And it is only a matter of time before the Baltimore team will be selling its merchandise nationwide; the plaintiffs are entitled to seek injunctive relief before that happens. Certainly *the* Baltimore Colts had a national following, and we do not doubt that the resonance of the name, and not merely the clamor of the Baltimoreans, motivated the Baltimore team's choice of "Colts," out of all the appealing animals in the ark.

■ It is as clear or clearer that venue is proper in Indiana. See 28 U.S.C. § 1391(b)(2); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Intellectual Property* § 32.22(3)(b)(iii) (3d ed. 1994), so we can turn to the merits of the trademark dispute, cautioning the reader that the expression of views that follows is tentative, as we do not wish to prejudice the outcome of the trial on the merits.

■ The Baltimore team wanted to call itself the "Baltimore Colts." To improve its litigating posture (we assume), it has consented to insert "CFL" between "Baltimore" and "Colts." A glance at the merchandise in the record explains why this concession to an outraged NFL has been made so readily. On several of the items "CFL" appears in small or blurred letters. And since the Canadian Football League is not well known in the United States—and "CFL" has none of the instant recognition value of "NFL"—the inclusion of the acronym in the team's name might have little impact on potential buyers even if prominently displayed. Those who know football well know that the new "Baltimore Colts" are a new CFL team wholly unrelated to the old Baltimore Colts; know also that the rules of Canadian football are different from those of American football and that teams don't move from the NFL to the CFL as they might from one conference within the NFL to the other. But those who do *not* know these things—and we shall come shortly to the question whether there are many of these football illiterates—will not be warned off by the letters "CFL." The acronym is a red herring, and the real issue is whether the new Baltimore team can appropriate the name "Baltimore Colts." The entire thrust of the defendants' argument is that it can.

■ They make a tremendous to-do over the fact that the district judge found that the Indianapolis Colts abandoned the trademark "Baltimore Colts" when they moved to Indianapolis. Well, of course; they were no longer playing football under the name "Baltimore Colts," so could not have used the name as the team's trademark; they could have used it on merchandise but chose not to, until 1991 (another story—and not one we need tell). When a mark is abandoned, it returns to the public domain, and is appropriable anew—in principle. In practice, because "subsequent use of [an] abandoned mark may

well evoke a continuing association with the prior use, those who make subsequent use may be required to take reasonable precautions to prevent confusion." 2 McCarthy, *supra*, § 17.01[2], at p. 17–3. This precept is especially important where, as in this case, the former owner of the abandoned mark continues to market the same product or service under a similar name, though we cannot find any previous cases of this kind. No one questions the validity of "Indianapolis Colts" as the trademark of the NFL team that plays out of Indianapolis and was formerly known as the Baltimore Colts. If "Baltimore CFL Colts" is confusingly similar to "Indianapolis Colts" by virtue of the history of the Indianapolis team and the overlapping product and geographical markets served by it and by the new Baltimore team, the latter's use of the abandoned mark would infringe the Indianapolis Colts' new mark. The Colts' abandonment of a mark confusingly similar to their new mark neither broke the continuity of the team in its different locations—it was the same team, merely having a different home base and therefore a different geographical component in its name—nor entitled a third party to pick it up and use it to confuse Colts fans, and other actual or potential consumers of products and services marketed by the Colts or by other National Football League teams, with regard to the identity, sponsorship, or league affiliation of the third party, that is, the new Baltimore team. *Browning King Co. of New York, Inc. v. Browning King Co.*, 176 F.2d 105, 107 (3d Cir.1949); *Acme Valve & Fittings Co. v. Wayne*, 386 F.Supp. 1162, 1169 (S.D.Tex.1974); cf. *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1228–29 (7th Cir.1993); *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012–13 (5th Cir.1975); *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651 (W.D.Wash.1982); Robert C. Denicola, "Institutional Publicity Rights: An Analysis of the Merchandising of Famous Trade Symbols," 62 *N.C.L.Rev.* 603, 611–12 (1984).

Against this the defendants cite to us with great insistence *Major League Baseball Properties Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F.Supp. 1103, 1128 (S.D.N.Y.1993), which, over the objection of the Los Angeles Dodgers, allowed a restaurant in Brooklyn to use the name "Brooklyn Dodger" on the ground that "the 'Brooklyn Dodgers' was a nontransportable cultural institution separate from the 'Los Angeles Dodgers.'" The defendants in our case argue that the sudden and greatly resented departure of the Baltimore Colts for Indianapolis made the name "Baltimore Colts" available to anyone who would continue the "nontransportable cultural institution" constituted by a football team located in the City of Baltimore. We think this argument very weak, and need not even try to distinguish *Sed Non Olet Denarius* since district court decisions are not authoritative in this or any court of appeals. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir.1987). If it were a Supreme Court decision it still would not help the defendants. The "Brooklyn Dodger" was not a baseball team, and there was no risk of confusion. The case might be relevant if the Indianapolis Colts were arguing not confusion but misappropriation: that they own the goodwill associated with the name "Baltimore Colts" and the new Baltimore team is trying to take it from them. Cf. *Quaker Oats Co. v. General Mills Co.*, 134 F.2d 429, 432 (7th Cir.1943). They did make a claim of misappropriation in the district court, but that court rejected the claim and it has not been renewed on appeal. The only claim in our court is that a significant number of consumers will think the new Baltimore team the successor to, or alter ego of, or even the same team as the Baltimore Colts and therefore the Indianapolis Colts, which is the real successor. No one would think the Brooklyn Dodgers baseball team reincarnated in a restaurant.

A professional sports team is like Heraclitus's river: always changing, yet always the same. When Mr. Irsay transported his team, the Baltimore Colts, from Baltimore to Indianapolis in one night in 1984, the team remained, for a time anyway, completely intact: same players, same coaches, same front-office personnel. With the passage of time, of course, the team changed. Players retired or were traded, and were replaced. Coaches and other nonplaying personnel came and went. But as far as the record

discloses there is as much institutional continuity between the Baltimore Colts of 1984 and the Indianapolis Colts of 1994 as there was between the Baltimore Colts of 1974 and the Baltimore Colts of 1984. Johnny Unitas, the Baltimore Colts' most famous player, swears in his affidavit that his old team has no connection with the Indianapolis Colts, and he has even asked the Colts to expunge his name from its record books. He is angry with Irsay for moving the team. He is entitled to his anger, but it has nothing to do with this lawsuit. The Colts were Irsay's team; it was moved intact; there is no evidence it has changed more since the move than it had in the years before. There is, in contrast, no continuity, no links contractual or otherwise, nothing but a geographical site in common, between the Baltimore Colts and the Canadian Football League team that would like to use its name. Any suggestion that there is such continuity is false and potentially misleading.

Potentially; for if everyone *knows* there is no contractual or institutional continuity, no pedigree or line of descent, linking the Baltimore–Indianapolis Colts and the new CFL team that wants to call itself the "Baltimore Colts" (or, grudgingly, the "Baltimore CFL Colts"), then there is no harm, at least no harm for which the Lanham Act provides a remedy, in the new Baltimore team's appropriating the name "Baltimore Colts" to play under and sell merchandise under. If not everyone knows, there is harm. Some people who might otherwise watch the Indianapolis Colts (or some other NFL team, for remember that the NFL, representing all the teams, is a coplaintiff) on television may watch the Baltimore CFL Colts instead, thinking they are the "real" Baltimore Colts, and the NFL will lose revenue. A few (doubtless very few) people who might otherwise buy tickets to an NFL game may buy tickets to a Baltimore CFL Colts game instead. Some people who might otherwise buy merchandise stamped with the name "Indianapolis Colts" or the name of some other NFL team may buy merchandise stamped "Baltimore CFL Colts," thinking it a kin of the NFL's Baltimore Colts in the glory days of Johnny Unitas rather than a newly formed team that plays Canadian football in a Canadian football league. It would be naive to suppose that no consideration of such possibilities occurred to the owners of the new Baltimore team when they were choosing a name, though there is no evidence that it was the dominant or even a major consideration.

Confusion thus is possible, and may even have been desired; but is it likely? There is great variance in consumer competence, and it would be undesirable to impoverish the lexicon of trade names merely to protect the most gullible fringe of the consuming public. The Lanham Act does not cast the net of protection so wide. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 n. 1 (7th Cir.1985); *Quaker Oats Co. v. General Mills Co., supra*, 134 F.2d at 432; 2 McCarthy, *supra*, § 23.27[4]; cf. *Gammon v. GC Services Limited Partnership*, 27 F.3d 1254 (7th Cir.1994). The legal standard under the Act has been formulated variously, but the various formulations come down to whether it is likely that the challenged mark if permitted to be used by the defendant would cause the plaintiff to lose a substantial number of consumers. Pertinent to this determination is the similarity of the marks and of the parties' products, the knowledge of the average consumer of the product, the overlap in the parties' geographical markets, and the other factors that the cases consider. The aim is to strike a balance between, on the one hand, the interest of the seller of the new product, and of the consuming public, in an arresting, attractive, and informative name that will enable the new product to compete effectively against existing ones, and, on the other hand, the interest of existing sellers, and again of the consuming public, in consumers' being able to know exactly what they are buying without having to incur substantial costs of investigation or inquiry.

To help judges strike the balance, the parties to trademark disputes frequently as here hire professionals in marketing or applied statistics to conduct surveys of consumers. 3 McCarthy, *supra*, § 32.55[2]; see also Jack P. Lipton, "Trademark Litigation: A New Look at the Use of Social Science Evidence," 29 *Ariz.L.Rev.* 639 (1987); Larry C. Jones, "Developing and Using Survey Evidence in

Trademark Litigation," 19 *Memphis St. U.L.Rev.* 471 (1989). The battle of experts that ensues is frequently unedifying. Cf. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir.1986). Many experts are willing for a generous (and sometimes for a modest) fee to bend their science in the direction from which their fee is coming. The constraints that the market in consultant services for lawyers places on this sort of behavior are weak, as shown by the fact that both experts in this case were hired and, we have no doubt, generously remunerated even though both have been criticized in previous judicial opinions. The judicial constraints on tendentious expert testimony are inherently weak because judges (and even more so juries, though that is not an issue in a trademark case) lack training or experience in the relevant fields of expert knowledge. But that is the system we have. It might be improved by asking each party's hired expert to designate a third, a neutral expert who would be appointed by the court to conduct the necessary studies. The necessary authority exists, see Fed.R.Evid. 706, but was not exercised here.

Both parties presented studies. The defendants' was prepared by Michael Rappeport and is summarized in a perfunctory affidavit by Dr. Rappeport to which the district judge gave little weight. That was a kindness. The heart of Rappeport's study was a survey that consisted of three loaded questions asked in one Baltimore mall. Rappeport has been criticized before for his methodology, *Jarret Int'l, Inc. v. Promotion in Motion, Inc.,* 826 F.Supp. 69, 73–74 (E.D.N.Y.1993), and we hope that he will take these criticisms to heart in his next courtroom appearance.

The plaintiffs' study, conducted by Jacob Jacoby, was far more substantial and the district judge found it on the whole credible. The 28–page report with its numerous appendices has all the trappings of social scientific rigor. Interviewers showed several hundred consumers in 24 malls scattered around the country, shirts and hats licensed by the defendants for sale to consumers. The shirts and hats have "Baltimore CFL Colts" stamped on them. The consumers were asked whether they were football fans, whether they watched football games on television, and whether they ever bought merchandise with a team name on it. Then they were asked, with reference to the "Baltimore CFL Colts" merchandise that they were shown, such questions as whether they knew what sport the team played, what teams it played against, what league the team was in, and whether the team or league needed someone's permission to use this name, and if so whose. If, for example, the respondent answered that the team had to get permission from the Canadian Football League, the interviewer was directed to ask the respondent whether the Canadian Football League had in turn to get permission from someone. There were other questions, none however obviously loaded, and a whole other survey, the purpose of which was to control for "noise," in which another group of mallgoers was asked the identical questions about a hypothetical team unappetizingly named the "Baltimore Horses." The idea was by comparing the answers of the two groups to see whether the source of confusion was the name "Baltimore Colts" or just the name "Baltimore," in which event the injunction would do no good since no one suggests that the new Baltimore team should be forbidden to use "Baltimore" in its name, provided the name does not also include "Colts."

Rappeport threw darts at Jacoby's study. Some landed wide. We are especially perplexed by the argument that survey research belongs to sociology rather than psychology (we leave the reader to guess the respective disciplines to which our rival experts belong); the courtroom is a peculiar site for academic turf wars. We also do not think it was improper for Jacoby to inquire about confusion between "Baltimore CFL Colts" and "Baltimore Colts," even though the Indianapolis Colts have abandoned "Baltimore Colts." If consumers believe that the new Baltimore team is the old Baltimore Colts, and the Indianapolis Colts some sort of upstart (the Johnny Unitas position), they will be less likely to buy merchandise stamped "Indianapolis Colts." But Rappeport was right to complain that the choice of "Horses" for the comparison team loaded the dice and that

some of Jacoby's questions were a bit slanted. That is only to say, however, that Jacoby's survey was not perfect, and this is not news. Trials would be very short if only perfect evidence were admissible.

Jacoby's survey of consumers' reactions to the "Baltimore CFL Colts" merchandise found rather astonishing levels of confusion not plausibly attributable to the presence of the name "Baltimore" alone, since "Baltimore Horses" engendered much less. (We don't like the name "Baltimore Horses," as we have said; but we doubt that a more attractive "Baltimore" name, the "Baltimore Leopards," for example, would have generated the level of confusion that "Baltimore CFL Colts" did. *National Football League v. Wichita Falls Sportswear, Inc., supra,* 532 F.Supp. at 660.) Among self-identified football fans, 64 percent thought that the "Baltimore CFL Colts" was either the old (NFL) Baltimore Colts or the Indianapolis Colts. But perhaps this result is not so astonishing. Although most American football fans have heard of Canadian football, many probably are unfamiliar with the acronym "CFL," and as we remarked earlier it is not a very conspicuous part of the team logo stamped on the merchandise. Among fans who watch football on television, 59 percent displayed the same confusion; and even among those who watch football on cable television, which attracts a more educated audience on average and actually carries CFL games, 58 percent were confused when shown the merchandise. Among the minority not confused about who the "Baltimore CFL Colts" are, a substantial minority, ranging from 21 to 34 percent depending on the precise subsample, thought the team somehow sponsored or authorized by the Indianapolis Colts or the National Football League. It is unfortunate and perhaps a bit tricky that the subsample of consumers likely to buy merchandise with a team name on it was not limited to consumers likely to buy merchandise with a *football* team's name on it; the choice of the name "Baltimore Horses" for the comparison team was unfortunate; and no doubt there are other tricks of the survey researcher's black arts that we have missed. There is the more fundamental problem, one common to almost all consumer survey research, that people are more careful when they are laying out their money than when they are answering questions.

But with all this granted, we cannot say that the district judge committed a clear error (the standard, *Scandia Down Corp. v. Euroquilt, Inc., supra,* 772 F.2d at 1427–28) in crediting the major findings of the Jacoby study and inferring from it and the other evidence in the record that the defendants' use of the name "Baltimore CFL Colts" whether for the team or on merchandise was likely to confuse a substantial number of consumers. This means—given the defendants' failure to raise any issue concerning the respective irreparable harms from granting or denying the preliminary injunction—that the judge's finding concerning likelihood of confusion required that the injunction issue.

The defendants argue, finally, that, even so, the injunction is overbroad; it should not have forbidden them to use the word "Colts," but rather confined them to using it in conjunction with "Baltimore CFL." We are baffled by the argument. If they want to use "Colts" in conjunction with anything besides a Baltimore football team, there is nothing in this lawsuit to prevent them. The objection is precisely to their use of the word in a setting that will lead many consumers to believe it designates either the old Baltimore Colts (falsely implying that the Indianapolis Colts are not the successor to the Baltimore Colts or that the new Baltimore team is an NFL team or is approved by or affiliated with the NFL) or the Indianapolis Colts.

The defendants make some other arguments but they do not have sufficient merit to warrant discussion. The judgment of the district court granting the preliminary injunction is

Affirmed.