131 F.3d 1210
 45 U.S.P.Q.2d 1187
 RUST ENVIRONMENT & INFRASTRUCTURE, INC., f/k/a SEC Donohue,
Inc., f/k/a Donohue & Associates, Inc., Plaintiff-Appellant,
v.
Larry TEUNISSEN, Donohue & Associates, Inc., and Donohue &
Associates of Illinois, Inc., Defendants-Appellees.
 No. 97-2462.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1997.
Decided Dec. 11, 1997.
 
 Peter K. Richardson (argued), Michael, Best & Friedrich, Milwaukee, WI, for Plaintiff-Appellant.
 David O. Gass, William TeWinkle (argued), Rohde, Dales, Melzer, TeWinkle & Gass, Sheboygan, WI, for Defendants-Appellees.
 Before CUMMINGS, EASTERBROOK and KANNE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff Rust Environment & Infrastructure, Inc. ("Rust") brought suit against defendants Donohue & Associates and founder Larry Teunissen for false designation of origin pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common law unfair competition, and deceptive advertising under Wis. Stats. § 100.18(1). Rust sought preliminary injunctive relief prohibiting defendants from using the trade name "Donohue & Associates" in connection with their wastewater engineering consulting services. The United States District Court for the Eastern District of Wisconsin refused to grant a preliminary injunction. From the order denying the injunction, plaintiff Rust appeals under 28 U.S.C. § 1292(a)(1). For the following reasons, we affirm.
 
 I. Facts
 
 2
 Rust is an environmental and engineering consulting firm providing services to private companies and governmental entities throughout the country. To frame this dispute, it is necessary to understand the history of Rust. In 1991, WMX Technologies, Inc. ("Waste Management") acquired Donohue & Associates ("Donohue I"), a corporation specializing in high-quality engineering and architectural services, particularly in the areas of water and wastewater engineering. Waste Management bought Donohue I and all its assets in a stock purchase from its employee shareholders, including defendant Teunissen. Donohue I received state and national recognition for its engineering achievements. From the late 1970s until 1993, at least $10 million was invested in marketing the Donohue name.
 
 
 3
 In 1992, Waste Management merged Donohue I with another environmental consulting firm to form SEC Donohue, Inc., and in March 1993, Waste Management changed the name from SEC Donohue to its current name of Rust Environment & Infrastructure. While plaintiff Rust alleges it used the Donohue name through early 1994, defendants claim that Rust intentionally moved away from any association with the Donohue name and toward a more national reputation under the Rust name.
 
 
 4
 Defendants are a newly formed engineering consulting firm, Donohue & Associates ("Donohue II"), and Larry Teunissen, a founder-employee who sold his ownership interest in Donohue II after this lawsuit began. Teunissen along with four other Rust employees formed Donohue II in January 1997. None are named Donohue. Defendants contend that the reason for the name choice was the founders' prior association with Donohue I and their hope of recalling the concept of an "employee-owned corporation with a strong team attitude." They believed that the name was "legally available for use as a corporate name." Defendants claim that they have tried to inform their potential clients that they are not affiliated with Rust, noting that this is apparent because their organization is much smaller than Rust, having only nine employees in contrast to Rust's approximately 2000. Rust contacted Donohue II several times in February and March of 1997 to perform services for Rust.
 
 
 5
 On March 11, 1997, Rust brought suit for false designation of origin pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common law unfair competition, and deceptive advertising under Wis. Stats. § 100.18(1).[1] Rust sought a preliminary injunction banning defendants from using the trade name "Donohue & Associates" in connection with their wastewater engineering consulting services.[2] On June 4, 1997, the United States District Court for the Eastern District of Wisconsin denied preliminary injunctive relief. We affirm.
 
 II. Preliminary Injunction Standards
 
 6
 A party seeking a preliminary injunction must demonstrate that (1) the moving party has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) the moving party will suffer irreparable harm without injunctive relief; (4) the irreparable harm suffered without injunctive relief outweighs the irreparable harm the defendant will suffer if the injunction is granted; and (5) the injunction will not harm the public interest. Nalco Chemical Co. v. Hydro Technologies, Inc., 984 F.2d 801, 802 (7th Cir.1993); Mil-Mar Shoe Co., Inc. v. Shonac Corp., 75 F.3d 1153, 1156 (7th Cir.1996). In order to prevail, the plaintiff must satisfy each element of this five-part test. Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386-388 (7th Cir.1984).
 
 
 7
 The threshold factor is likelihood of success on the merits. See O'Connor v. Board of Ed. of School Dist. No. 23, 645 F.2d 578, 580 (7th Cir.1981), certiorari denied, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619. Thus, this Court turns to the merits of the trademark dispute, cautioning that the analysis which follows is tentative, since this case involves a preliminary injunction and we do not to wish to prejudice the outcome of the trial on the merits. Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 412 (7th Cir.1994).
 
 III. Lanham Act Unfair Competition Claim
 
 8
 Federal trademark law is governed by the Lanham Act. Section 43(a) of the Lanham Act prohibits a person from falsely designating the origin of his or her goods or services in the practice of unfair competition and provides that
 
 
 9
 Any person who, on or in connection with any goods or services, * * * uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin * * * which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation * * * of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, * * * shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.
 
 
 10
 15 U.S.C. § 1125(a)(1).
 
 
 11
 Under sec.1125(a), a plaintiff making a claim of false designation of origin must show that the mark is entitled to protection as a trademark, Mil-Mar Shoe, 75 F.3d at 1161, and that the false designation of origin creates a likelihood of confusion. 15 U.S.C. § 1125(a)(1). However, under 15 U.S.C. § 1127, abandonment of a mark is an affirmative defense to a trademark infringement action. See Sands, Taylor & Wood v. Quaker Oats Co., 978 F.2d 947, 954-955 (7th Cir.1992) (citing 15 U.S.C. § 1127), certiorari denied, 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497. Therefore, the threshold question is whether plaintiff Rust's abandonment of the name "Donohue & Associates" bars a trademark claim.
 
 A. Abandonment
 
 12
 Under 15 U.S.C. § 1127, "[a] mark shall be deemed to be 'abandoned' * * * (1) When its use has been discontinued with intent not to resume such use * * * * Nonuse for two consecutive years shall be prima facie evidence of abandonment." See Sands, Taylor & Wood, 978 F.2d at 955. Based on this standard, plaintiff Rust has abandoned the name "Donohue & Associates."
 
 
 13
 Rust relies on this Court's decision in Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410 (7th Cir.1994), in arguing that such prima facie evidence of abandonment is not the end of the inquiry. Rust points to the panel's language stating that "[w]hen a mark is abandoned, it returns to the public domain, and is appropriable anew--in principle. In practice, because 'subsequent use of [an] abandoned mark may well evoke a continuing association with the prior use, those who make subsequent use may be required to take reasonable precautions to prevent confusion.' " Id. at 412-413 (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Intellectual Property § 17.01, at 17-3 (3d ed.1994)). However, Rust's reliance on Indianapolis Colts is misguided. That case is readily distinguishable because there plaintiffs were continuing to use a mark confusingly similar to the abandoned mark, whereas here Rust abandoned the Donohue mark without continuing to use any mark even remotely resembling "Donohue & Associates."
 
 
 14
 In Indianapolis Colts, the Indianapolis Colts, a National Football League team, sought to enjoin the defendants from naming their Canadian Football League team the Baltimore CFL Colts. The Indianapolis Colts had been formerly known as the Baltimore Colts until the team moved to Indiana in 1984 and changed its name to reflect its new location. Nine years later, the Canadian Football League granted a franchise for a Baltimore team which ultimately named itself the Baltimore CFL Colts. The Indianapolis Colts claimed confusion between the new "Baltimore CFL Colts" and the "Indianapolis Colts" in violation of 15 U.S.C. § 1125(a). Id. at 411. We affirmed the district court's issuance of a preliminary injunction against the defendants prohibiting use of the name "Baltimore CFL Colts." Id. at 416.
 
 
 15
 In reaching its decision, this Court first addressed the issue of abandonment, finding that the Indianapolis Colts technically abandoned the name "Baltimore Colts" when they moved to Indianapolis because "they were no longer playing football under the name 'Baltimore Colts,' so could not have used the name as the team's trademark." Id. at 412. The panel emphasized that abandonment may not be the end of the inquiry where "as in this case, the former owner of the abandoned mark continues to market the same product or service under a similar name, though we cannot find any previous cases of this kind." Id. at 413. Conceding Indianapolis Colts to be one-of-a-kind, the panel relied on the fact that while the Indianapolis Colts technically abandoned the mark "Baltimore Colts," they adopted a new mark, "Indianapolis Colts," which was confusingly similar to the abandoned mark, both involving the concept "Colts." Based on the facts, this Court ruled that where a party abandons a mark confusingly similar to its newly adopted mark, a third party may not necessarily be entitled to use the abandoned mark in a way that is confusingly similar to the newly adopted mark. Id. The panel noted that "[i]f 'Baltimore CFL Colts' is confusingly similar to 'Indianapolis Colts' by virtue of the history of the Indianapolis team and the overlapping product and geographic markets served by it and by the new Baltimore team, the latter's use of the abandoned mark would infringe the Indianapolis Colts' new mark." Id. In finding that "Baltimore CFL Colts" was confusingly similar to "Indianapolis Colts," we reasoned that "[t]he Colts' abandonment of a mark confusingly similar to their new mark [did not break] the continuity of the team in its different locations--it was the same team, merely having a different home base and therefore a different geographical component in its name," so that a third party was not entitled to use it to confuse Colts fans. Id.
 
 
 16
 This case simply does not fit into the unique fact pattern of Indianapolis Colts. Here the plaintiff abandoned the name Donohue and replaced it with the name Rust, a name having no similarity to its abandoned name. Thus the key feature of Indianapolis Colts, continued use by the plaintiff of a mark confusingly similar to plaintiff's abandoned mark, is lacking.
 
 
 17
 In claiming that defendants should be enjoined from using the name Donohue & Associates, Rust argues that "Donohue & Associates" is confusingly similar to its previous name of "Donohue & Associates" (Br.22-23). However, this argument confuses the relevant comparison in Indianapolis Colts. As stated there, "if 'Baltimore CFL Colts' is confusingly similar to 'Indianapolis Colts' * * * [then the Baltimore CFL Colts'] use of the abandoned mark would infringe the Indianapolis Colts' new mark." Indianapolis Colts, 34 F.3d at 413. This Court emphasized that the relevant comparison is between the new name adopted by the third party ("Baltimore CFL Colts") and the new name adopted by the holder of the abandoned mark ("Indianapolis Colts"); the Court did not compare the new name adopted by the third party ("Baltimore CFL Colts") with the abandoned name ("Baltimore Colts"). It follows that the relevant comparison here is between the new name adopted by the third party ("Donohue & Associates") and the new name adopted by the holder of the abandoned mark ("Rust"). The comparison is not, as plaintiff argues, between the new name adopted by the third party ("Donohue & Associates") and the abandoned name ("Donohue & Associates").
 
 
 18
 Once the relevant comparison is made, the distinction between the two cases can be seen. Because the Indianapolis Colts adopted a new mark confusingly similar to their abandoned mark, the Baltimore CFL Colts were not entitled to use the abandoned mark to confuse Colts' fans and consumers. Id.[3] Here, because plaintiff adopted a new mark, "Rust," which was not confusingly similar to its abandoned mark, "Donohue & Associates," the unique facts of Indianapolis Colts are not present, and defendants' use of the abandoned name "Donohue & Associates" is not a violation of the Lanham Act.
 
 
 19
 In addition, it is worth mentioning that Indianapolis Colts is factually distinguishable from the instant case on yet another basis. In a case where subsequent use of an abandoned mark evokes a continuing association with the prior use, Indianapolis Colts concluded that " 'those who make subsequent use may be required to take reasonable precautions to prevent confusion.' " Id. at 412-13 (quoting 2 McCarthy, supra, § 17.01, at 173). This Court did not conclude, as plaintiff Rust contends (Br.14), that subsequent use of the abandoned mark is categorically forbidden. Rather, we indicated that appropriation of an abandoned mark might be allowed if those who make subsequent use take reasonable precautions to prevent confusion. Indianapolis Colts, 34 F.3d at 413. In that opinion, we found that the defendants did not take any steps to enlighten consumers that the Baltimore CFL Colts was a new and different franchise, noting that the "CFL" on merchandise appeared only in small or blurred letters. Id. at 412. Here, however, defendants took reasonable precautions to prevent confusion by informing customers who did not know the history of the companies that defendants were not affiliated with Rust. Thus, even if the facts of this case brought it within the narrow holding of Indianapolis Colts, defendants nonetheless satisfied the test established in that case by taking reasonable precautions to prevent confusion.
 
 B. Likelihood of Confusion
 
 20
 In Indianapolis Colts, this Court stated that abandonment was not the end of the inquiry when plaintiffs continued to use a mark confusingly similar to their abandoned mark. Therefore, we considered it necessary to enter into a likelihood of confusion analysis as mandated by § 1125(a), reasoning that while confusion is possible and may even have been desired, confusion must be likely in order to enjoin use of the trademark. Id. at 414.
 
 
 21
 In contrast to Indianapolis Colts, this case does not involve a party abandoning a mark confusingly similar to its newly adopted mark. Therefore, abandonment could be the end of the inquiry. Even if this Court applied a likelihood of confusion analysis as the district court did, and as this Court did in Indianapolis Colts, the injunction still would be denied because consumers are not likely to be confused between Rust and the new Donohue (Donohue II).
 
 
 22
 The test for likelihood of confusion is whether the defendant's use of the challenged mark would cause the plaintiff to lose a substantial number of consumers. Id. In determining whether confusion is likely, it is necessary to analyze seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to 'palm-off his product as that of another.' " Smith Fiberglass Products, Inc. v. Ameron, Inc., 7 F.3d 1327, 1329 (7th Cir.1993). This determination is made "with reference to the realities of consumer behavior in the relevant market." Dorr-Oliver, Inc. v. Fluid-Quip, Inc., 94 F.3d 376, 381 (7th Cir.1996).
 
 
 23
 Likelihood of confusion is a question of fact and is reviewed under the clearly erroneous standard. Smith Fiberglass, 7 F.3d at 1329. A finding of fact is clearly erroneous only if based on the entire evidence the court is " 'left with the definite and firm conviction that a mistake has been committed.' " Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746). As elaborated in Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423 (7th Cir.1985), certiorari denied, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346, "[t]he district court's authority to decide factual issues is just that--authority * * * * The district judge is manager of the entire swirl of facts, and the clearly erroneous rule is based in substantial measure on a belief that because appellate courts never are in a better position than the district court, and often are in a worse one, * * * '[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.' " Id. at 1428 (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518). Thus this Court has stated that " '[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " Id. at 1429 (quoting Anderson, 470 U.S. at 574, 105 S.Ct. at 1511).
 
 
 24
 Therefore, we briefly go through the seven factors to determine whether or not confusion is likely, giving deserved deference to the district court's thorough fact-finding and well-reasoned analysis.
 
 
 25
 (1) Similarity of Marks
 
 
 26
 The district court found that the prior use and the present use of the mark are identical. We note, however, that "none of the seven factors alone are dispositive, and the weight accorded to each factor will vary from case to case." Smith Fiberglass, 7 F.3d at 1329. Furthermore, the two present uses of the marks "Donohue & Associates" and "Rust" are not identical.
 
 
 27
 (2) Similarity of Products
 
 
 28
 The district court next found that the products are similar in that both Rust and Donohue II are competing engineering consulting firms with specialities in the water and wastewater areas and, therefore, confusion is more likely.
 
 
 29
 (3) Area and Manner of Concurrent Use
 
 
 30
 While Rust is a national firm and Donohue focuses on the Midwest Region, the court noted that the concurrent use of the mark in the Midwestern states could cause confusion. However, the court found that the fact that Donohue II identifies itself as a new firm and uses a different logo tends to prevent confusion.
 
 
 31
 (4) Consumers' Degree of Care
 
 
 32
 The knowledge and care of those who contract with wastewater engineering consultants are significant factors in determining whether consumers are likely to be confused by similar marks. As stated by this Court, "[t]here is great variance in consumer competence, and it would be undesirable to impoverish the lexicon of trade names merely to protect the most gullible fringe of the consuming public. The Lanham Act does not cast the net of protection so wide." Indianapolis Colts, 34 F.3d at 414. We have found that where consumers are sophisticated, deliberative buyers, confusion is less likely. See Smith Fiberglass, 7 F.3d at 1330 (finding consumers purchasing conductive pipe sophisticated and discriminating and thus not likely to be confused).
 
 
 33
 Because the relevant market of consumers is composed of sophisticated buyers of services in a highly specialized technical field, the district court found it unlikely that potential consumers would mistakenly purchase services from Donohue II believing it to be Rust or Donohue I. The court noted that the market is competitive and consumers of wastewater engineering consulting services are knowledgeable about the various providers and enter into contracts only after consideration of detailed proposals. While recognizing that some consumers may know Rust better as "Donohue & Associates," the court found that consumers of wastewater engineering services are likely to look beyond a firm's name before making any contractual commitments. Thus any misunderstanding as to Donohue II's identity would almost certainly be dispelled long before a consumer entered into a contract with Donohue II.
 
 
 34
 The district court recognized that initial interest confusion is also forbidden by the Lanham Act. "[T]he Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods [or services] as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated." Dorr-Oliver, 94 F.3d at 382. Such "initial interest" confusion allows "the competitor to get its foot in the door by confusing consumers." Id. The district court found it a close call as to whether there was likelihood of consumer confusion between Donohue II and Rust in initial contacts. However, it ultimately found that Rust's survey evidence[4] and the consumers' sophistication given the small market of wastewater engineers and high cost of wastewater projects indicate that such confusion is unlikely. In addition, the court found initial interest confusion unlikely because Donohue II's employees take precautions by introducing and advertising themselves as part of a new firm.
 
 
 35
 (5) Strength of Mark
 
 
 36
 The district court correctly determined that "Donohue & Associates" is a strong mark which is distinctive in the field of engineering consulting services.
 
 
 37
 (6) Actual Confusion
 
 
 38
 Actual confusion can be shown by either direct evidence or by survey evidence. While there was some direct evidence of actual confusion, the district court found such instances rare and trivial in effect, providing no indication that anyone proceeded to a decision-making step with a misapprehension as to Donohue II's true identity. In addition, the court found the direct evidence weak since none of it came from consumers in a decision-making posture.
 
 
 39
 As for survey evidence in trademark disputes, this Court has stated that "[t]he battle of experts that ensues is frequently unedifying." Indianapolis Colts, 34 F.3d at 415. Rust commissioned a survey by Dennis Corrigan, whom the court accepted as a qualified expert in survey design and execution. The survey asked participants to identify firms which came to mind for wastewater engineering consulting and followed up by prompting participants for other Wisconsin firms providing wastewater consulting. After being asked whether they had heard of Donohue & Associates (and other firms), they were asked to describe the firm and, if necessary, characterize the firm as old or new and indicate how long it had been around.
 
 
 40
 The district court discounted Rust's survey because it suffered "from significant deficiencies and did not pass muster." First, the court noted that Corrigan had never before designed a consumer survey regarding likelihood of confusion in a trademark case. Second, the court found that the survey itself was flawed in that it was not a random probability survey, was not a double blind survey, did not give adequate instructions to interviewers, did not require recording of verbatim responses, did not incorporate random rotation of corporate names, and did not comport with accepted practice for independent validation of the results. Third, the court emphasized that even if the survey design and execution were valid, the survey results were interpreted incorrectly and did not demonstrate a likelihood of confusion. The district court astutely noted that the relevant comparison should have been between Rust and Donohue II, yet the survey attempted to show association between the Donohue name, standing alone, and Rust. Noting that association of Donohue I with Rust would be expected "because Donohue I was well-established in the field, and many in the field would have known about how Donohue I ultimately became part of Rust," the court found that "[w]hat is critical is the dearth of evidence showing confusion between Rust and Donohue II." While Corrigan interpreted the survey to show confusion between Rust and Donohue II, the court found that responses to the survey did not prove such confusion but rather only proved, at a minimum, an association between Rust and Donohue I. Furthermore, responses indicated that consumers were aware that Donohue II was associated with Rust only to the extent that it is made up of former Rust employees, indicating no confusion between Rust and Donohue II.
 
 
 41
 The district court found qualified expert Phyllis J. Welter's interpretation of the survey more credible and relevant. Based on the responses, Welter found no likelihood of confusion, for only 1 of 55 respondents indicated any possibility of confusion between Donohue II and Rust. Welter found that 56% of respondents were aware of the history of at least Donohue I and Rust, indicating a knowledgeable client base, and 38% had knowledge of all the firms, indicating that they were not confused. She found that 35% were unfamiliar with the firms, demonstrating that they could not confuse Donohue II with Rust. Finally, she noted that 25% of respondents had not heard of Donohue II, so that it was indeterminable whether they would be confused upon exposure to Donohue II but plausible they would recognize Donohue II as different.
 
 
 42
 While the surveys were far from enlightening, we cannot say that the district court committed a clear error in discounting Corrigan's interpretation and crediting Welter's and inferring from the battle of experts and the other evidence that defendants' use of the name "Donohue & Associates" was not likely to confuse a substantial number of consumers.
 
 
 43
 (7) Defendants' Intent
 
 
 44
 If a defendant willfully appropriates the mark of another, a court is more inclined to find likelihood of confusion. While proof of a defendant's intent might be weak evidence of consumer confusion, "the difficulty in determining the state of mind of consumers has led courts to draw a reasonable inference from the state of mind of the accused infringer." 2 McCarthy, supra, § 23:110. Rust contends that defendants admitted that they selected "Donohue & Associates" because they "recognize[d] that the name would have some recollection in the marketplace." However, defendants contend that their intent was not to trade on the name but rather was to recall a past history of teamwork that existed when they worked at Donohue I. The court found the defendants' testimony credible. Furthermore, the court noted that the fact that Rust did not reserve the name and its president did not object to its use when told the proposed name in January 1997 indicates defendants could have adopted "Donohue" with no intent to misappropriate a name valuable to Rust. While stressing that other factors provided more direct evidence and deserved more weight, the court nonetheless found that defendants' intent did not favor a likelihood of confusion. The district court was not clearly erroneous in reaching this conclusion.
 
 
 45
 After reviewing the seven factors, we do not find that the district court committed clear error in finding that confusion is unlikely and thus plaintiff Rust is unable to prevail on the merits. Because a party seeking a preliminary injunction must satisfy each element of the five-part test and plaintiff Rust is unable to demonstrate likelihood of success on the merits, it is not necessary to analyze the other elements required for preliminary injunctive relief such as irreparable injury and the balance of harms.
 
 IV. Common Law Unfair Competition Claim
 
 46
 We likewise affirm the district court's decision that plaintiff was not likely to succeed on the merits of its claim of common law unfair competition. The district court concluded that the standard applied to determine whether injunctive relief is warranted in a trade-name unfair competition case is "confusing similarity" or "likelihood of confusion." Spheeris Sporting Goods, Inc. v. Spheeris on Capitol, 157 Wis.2d 298, 308, 459 N.W.2d 581 (Wis.App.1990) (finding that unfair competition is established when there is "a likelihood of deception from names that are confusingly similar"). "The test of whether there is a likelihood of confusion is whether 'an appreciable number of ordinarily prudent prospective purchasers will be confused.' " Id. at 309, 459 N.W.2d at 586 (citing Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F.Supp. 4, 15 (E.D.N.Y.1969)). Looking to the totality of the circumstances, the test explores "the character of goods or services, their use, the characteristics of the consumer group, and the manner of sale" as well as the trade names themselves. Id. at 309, 459 N.W.2d at 586. This test is the same as that for likelihood of confusion under the Lanham Act, and the standard of review is also identical since both are questions of fact. See Madison Reprographics, Inc. v. Cook's Reprographics, Inc., 203 Wis.2d 226, 238, 552 N.W.2d 440 (Wis.App.1996). Because the same standard applies to both the unfair competition and Lanham Act claims, and the district court concluded that there was no likelihood of confusion between defendants' "Donohue & Associates" mark and "Rust," Rust has no likelihood of prevailing on the merits as to its state law unfair competition claim.
 
 V. Conclusion
 
 47
 We affirm the district court's refusal to grant preliminary injunctive relief prohibiting defendants from using the trade name "Donohue & Associates" in connection with their wastewater engineering consulting services. In contrast to Indianapolis Colts, this case does not involve continued use by the plaintiff of a mark confusingly similar to plaintiff's abandoned mark. Because plaintiff abandoned the "Donohue & Associates" mark and adopted the new mark "Rust" which was not confusingly similar to its abandoned mark, defendants' use of the abandoned mark "Donohue & Associates" is not a violation of the Lanham Act.
 
 
 48
 Additionally, even if the facts of this case brought it within the narrow holding of Indianapolis Colts, defendants nonetheless satisfied the test established in that case because they took reasonable precautions to prevent confusion by informing potential customers that they were not affiliated with Rust.
 
 
 49
 Rust failed to prove a likelihood of consumer confusion between Rust and Donohue II. Therefore, Rust is unlikely to prevail on the merits of both its Lanham Act claim and its common law unfair competition claim, and the district court was within its discretion in denying a preliminary injunction.
 
 
 50
 Judgment AFFIRMED.
 
 
 
 [1]
 Rust also claimed breach of contract. However, the parties reached a stipulation that resolved the motion for injunctive relief as to the breach claim which is therefore defunct
 
 
 [2]
 Rust also sought compensatory damages, reasonable attorneys' fees, punitive damages, and injunctive relief. However, this appeal relates only to the district court's determination regarding preliminary injunctive relief
 
 
 [3]
 Specifically, this Court stated that "[t]he Colts' abandonment of a mark confusingly similar to their new mark neither broke the continuity of the team in its different locations * * * nor entitled a third party to pick it up and use it to confuse Colts fans * * * * " Indianapolis Colts, 34 F.3d at 413
 
 
 [4]
 Emphasizing that the real risk of confusion is with those who have not heard of Donohue II, have heard of Rust and Donohue I, and are unaware of Donohue I's history with Rust, the court found this group to constitute only 9%. The survey evidence will be discussed in more detail in Part B(6)