**James EDMOND, Joell Palmer, on their own behalf and on behalf of a class of those similarly situated, Plaintiffs,**

v.

**Stephen GOLDSMITH, in his official capacity as Mayor of the City of Indianapolis, Indiana; Indianapolis, Indiana; and Unknown Members of the Indianapolis Police Department, Defendants.**

No. IP 98–1400–C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 18, 1998.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, for plaintiffs.

Thomas Satron, Chief Litigation Counsel, Office of Corporate Counsel, City of Indianapolis, Indianapolis, IN, for defendant.

## ENTRY GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BARKER, Chief Judge.

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction in which Plaintiffs seek to enjoin Defendants from conducting drug interdiction checkpoints, and Plaintiffs' Motion for Class Certification. While we GRANT Plaintiffs' Motion for Class Certification, we must DENY Plaintiffs' Motion for Preliminary Injunction because the City of Indianapolis' use of drug interdiction checkpoints does not violate the Fourth Amendment to the United States Constitution.

## I. BACKGROUND[1]

Since August of 1998, the Indianapolis Police Department (IPD), in cooperation with other law enforcement agencies, has conducted at least six drug interdiction checkpoints at various locations in Indianapolis. The primary goal of the checkpoints is to interrupt the flow of illegal narcotics throughout Indianapolis.

The parties have agreed that for purposes of Plaintiffs' request for preliminary injunctive relief, it will be assumed that the checkpoints are being, and would continue to be, conducted in accordance with the IPD's written guidelines.[2] Those guidelines are as follows:

### DRUG CHECKPOINT CONTACT OFFICER DIRECTIVES BY ORDER OF THE CHIEF OF POLICE

1. Upon approaching vehicle, ask driver for license and registration. Advise the citizen that they are being stopped briefly at a drug checkpoint.

2. Look for signs of impairment, conduct open view examination of vehicle from outside vehicle.

3. If you have articulable reasons to reasonably believe the person might be armed, you should ask the person to exit the vehicle where a pat-down in conformance to the rule of Terry v. Ohio should be performed in an attempt to locate a weapon.

4. If you have an articulable reason to reasonably believe the person might be armed, you may also search the passenger compartment of the vehicle for a weapon.

5. A warrantless search of a vehicle is permitted if the person in control of the vehicle gives a valid consent to search. The officer may not overbear the will of the person consenting. A court will look at the totality of the circumstances to determine if the consent was given willingly and

---

1. The parties stipulate to the material facts. Hence, an evidentiary hearing on the preliminary injunction motion was unnecessary. See Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1171 (7th Cir.1997) (hearing on preliminary injunction unnecessary if no genuine issues of material fact); Syntex Ophthalmics, Inc. v. Tsuetaki, 701 F.2d 677, 682 (7th Cir. 1983) (same).

2. The parties stipulate to these material facts only for purposes of the preliminary injunction motion. (See Stipulation of the Parties.)

knowingly. If the person is in custody (beyond being stopped at the checkpoint), then Indiana law requires the person be warned of their right to counsel before giving consent to the police to search.

6. A warrantless search of a vehicle is also permitted if the officer has probable cause to believe the vehicle contains contraband, evidence or fruits of crimes. Probable cause is determined on the basis of whether a reasonable person would believe that seizable objects would be found in the vehicle. An indication from a trained drug detection dog would establish probable cause.

7. A vehicle in police custody which is to be towed may be inventoried pursuant to General Order 9.02. The towing of a vehicle must be "reasonable" before a court will permit an inventory to be conducted.

8. EVERY VEHICLE BEING STOPPED MUST BE EXAMINED IN THE *SAME* MANNER UNTIL PARTICULARIZED SUSPICION OR PROBABLE CAUSE DEVELOPS. THERE WILL BE NO EXCEPTIONS! A DRUG DETECTION DOG WILL WALK AROUND AND EXAMINE *EVERY* VEHICLE STOPPED AT THE CHECKPOINT.

9. THERE WILL BE NO DISCRETION GIVEN TO ANY OFFICER TO STOP ANY VEHICLE OUT OF SEQUENCE. WHEN THE SEQUENCE OF VEHICLES HAVE (sic) BEEN TOTALLY DEALT WITH AND EITHER RELEASED OR SEIZED, *THE VERY NEXT* SEQUENCE OF VEHICLES WILL BE STOPPED. *NO VEHICLES WILL BE PERMITTED TO PASS THE CHECKPOINT BEFORE ANOTHER SEQUENCE IS STOPPED AFTER ALL VEHICLES IN THE CURRENT SEQUENCE HAVE BEEN RELEASED OR SEIZED.*

(Stipulation of the Parties, Attachment 1.)

Approximately thirty (30) Indianapolis Police Department officers are present at each checkpoint, along with patrol cars containing mobile date terminals. (Stipulation of the Parties at ¶ 7.) Not every vehicle encountering the checkpoint area is stopped. Rather, prior to the operation of the checkpoint, IPD supervisors determine how many vehicles will be stopped at a time. (Marshall Depew Affidavit at ¶ 3.) The checkpoints are begun by stopping the predetermined number of vehicles. (*Id.* at ¶ 4.) The rest of the traffic is allowed to proceed with no interruption until the stopped vehicles have all been initially processed and either allowed to proceed or diverted for further processing. (*Id.*) When the last of the initially stopped vehicles has left, then the next group (of the same predetermined number) of vehicles is stopped for processing. (*Id.*) These stops continue in this manner, with no discretion in the number of vehicles stopped or which vehicles are stopped. (*Id.*) "When drivers are stopped, the officers ask for [their driver's] license and [vehicle] registration. If the driver does not possess a valid license and registration, then the information is run through the mobile data terminal in the adjacent police car." (Stipulation of the Parties at ¶ 7.) A typical stop lasts 2 to 3 minutes. (Depew Aff. at ¶ 5.)

## II. *CLASS CERTIFICATION*

Plaintiffs move for class certification for purposes of injunctive and declaratory relief.[3] Federal Rule of Civil Procedure 23(c)(1) directs district courts to rule on the issue of class certification "as soon as practicable." *See Koch v. Stanard,* 962

---

**3.** A hearing is not required prior to granting or denying a motion for class certification. *See Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 459 (11th Cir.1996); *Hartman v. Duffey,* 19 F.3d 1459, 1473 (C.A.D.C.1994).

F.2d 605, 607 (7th Cir.1992). Therefore, a court must resolve such issues before it addresses dispositive motions. *See De-Bruyne v. Equitable Life Assurance Society,* 920 F.2d 457, 463 (7th Cir.1990); *Bieneman v. City of Chicago,* 838 F.2d 962 (7th Cir.1988); *Hickey v. Duffy,* 827 F.2d 234 (7th Cir.1987). Although Plaintiffs' motion for a preliminary injunction is not dispositive, we feel compelled nevertheless to address the class certification question before resolving the issue of preliminary injunctive relief.[4]

The parties stipulate to a certification of the Plaintiffs' class, as follows:

> any and all persons driving vehicles who have been stopped or [are] subject to being stopped in the future at the drug interdiction roadblocks maintained by the City of Indianapolis in an attempt to interdict and curtail unlawful drugs and unlawful drug use.

(Stipulation to Certify Cause as a Class Action.)

■ Although the parties stipulate to the certification, the court has a duty to evaluate independently the proposed class to ensure its compliance with Fed.R.Civ.P. 23. *See Retired Chicago Police Assn. v. City of Chicago,* 7 F.3d 584, 599 (7th Cir. 1993). Rule 23(a) sets forth the general prerequisites to a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

■ In this case, Plaintiffs clearly meet these threshold requirements. First, the class probably exceeds one half million members and continues to grow each day, rendering joinder of all members of the class impracticable. Second, the legal issues surrounding the roadblocks are largely the same, with the principal dispute being their constitutionality. Third, the claims of the representative parties are typical of the claims of the class. Finally, the party representatives appear committed to this cause and their counsel is a very capable and skilled attorney, with extensive experience in similar matters.

Rule 23(b) contains additional requirements for class actions. First, separate actions must create a risk of inconsistent adjudications or adjudications that would be dispositive of the interest of other members not parties. *See* Fed.R.Civ.P. 23(b)(1). Second, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *See* Fed.R.Civ.P. 23(b)(2).[5]

---

4. Plaintiffs bring their Complaint as a class action for declaratory and injunctive relief and as an individual action for damages. One may well question the need to bring any part of the Complaint as a class action, as a ruling on the constitutionality of the checkpoints will inevitably apply to all motorists in Indianapolis. But in the Seventh Circuit, "it is clear that, if the prerequisites and conditions of Rule 23 have been met, a court may not deny class status because there is no 'need' for it." *Vickers v. Trainor,* 546 F.2d 739, 747 (7th Cir.1976); *Bieneman v. City of Chicago,* 838 F.2d 962, 964 (7th Cir.1988); *see also* 7B Wright, Miller & Kane, Federal Practice and Procedure § 1785.2 (1986 & Supp.1998). Even if certification is unneces-

sary for practical reasons, certification may not be denied if Rule 23 is satisfied. *See Paul v. State of Indiana Election Board,* 743 F.Supp. 616, 618 (S.D.Ind.1990) (Barker, J.).

5. Fed.R.Civ.P. 23(b)(3) requires that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. These requirements, however, apply only to classes that seek damages. They do not apply to a class, like the one proposed here, that seeks only injunctive and declaratory relief. *See Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1267 (7th Cir.1983).

Both of these requirements are also easily satisfied here. Separate adjudications on this issue would certainly create the risk of inconsistent rulings, in addition to potentially disposing of the issue of the checkpoints' constitutionality without the involvement of all class members. Further, Defendants' actions impact all the proposed class members as a group, thereby making injunctive relief appropriate. Accordingly, we find that Plaintiffs satisfy all the conditions for a Rule 23(b)(2) class action, and we thus *CERTIFY* Plaintiffs' class.

## III. *PRELIMINARY INJUNCTION*

■ We now turn to the heart of this dispute—Plaintiffs' Motion for Preliminary Injunction. When evaluating a motion for preliminary injunctive relief, we must determine whether the party seeking relief has demonstrated that: (1) there is a reasonable likelihood of success on the merits of its claim; (2) no adequate remedy at law exists; (3) irreparable harm will result if preliminary injunctive relief is denied; (4) the irreparable harm suffered without preliminary injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998); *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1213 (7th Cir.1997). "The threshold consideration in a motion for a preliminary injunction is the moving party's likelihood of success on the merits of the underlying claim." *Id.*

Plaintiffs contend that Defendants have violated the Fourth Amendment by using roadblocks to seize motorists without individualized suspicion for the primary purpose of determining if they possess or are under the influence of illegal drugs.[6]

■ There is no question that stopping a vehicle at a traffic checkpoint by law enforcement officers constitutes a seizure within the meaning of the Fourth Amendment. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *United States v. Trevino,* 60 F.3d 333, 336 (7th Cir.1995). To be reasonable under the Fourth Amendment, a seizure ordinarily must be based on individualized suspicion of wrongdoing. *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). However, the Supreme Court has held that individualized suspicion is unnecessary when the seizure is a brief stop for questioning or observation at a sobriety or immigration roadblock. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (sobriety); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (immigration). The Court has also strongly implied that such roadblocks for driver's license and vehicle registration checks are permissible. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (approving in dicta); *see also United States v. Trevino,* 60 F.3d 333, 336 (7th Cir.1995) (upheld checkpoint for license and insurance checks).

The Supreme Court has held that a Constitutional challenge to a law enforcement checkpoint turns on whether the initial stop at the checkpoint was reasonable. *Id.; see also Trevino,* 60 F.3d at 336. This, in turn, requires a balancing of the intrusion on the individual's Fourth Amendment rights occasioned by the initial stop against the promotion of legitimate governmental interests (hereinafter referred to as the *Brown* balancing test). *Sitz,* 496 U.S. at 449–50, 110 S.Ct. at 2484–85; *Brown v. Texas,* 443 U.S. 47, 49, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In applying the *Brown* balancing test, the Supreme Court has stated that district courts must

---

6. The Fourth Amendment was incorporated against the states by the Fourteenth Amendment's Due Process Clause. *See Contreras v.*

*City of Chicago,* 119 F.3d 1286, 1290 (7th Cir.1997).

consider the circumstances of both the "objective intrusion" of the seizure—the duration of the stop itself and the intensity of any questioning and visual inspection that might attend it, *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486,—and the "subjective intrusion"—its potential for generating fear and surprise to law-abiding motorists. *Id.; see also Trevino*, 60 F.3d at 336.

### A) BROWN BALANCING TEST DE-TERMINES THE CONSTITUTION-ALITY OF DEFENDANTS' CHECK-POINTS

Plaintiffs contend that the *Brown* balancing test does not apply in this case and, thus, cannot justify the checkpoints. According to Plaintiffs, the *Brown* balancing test is appropriate only if the government can demonstrate a "special need" for the checkpoints beyond the normal need for criminal law enforcement. (Plaintiffs' Memorandum in Support at 7–9) (*citing Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) and *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). Plaintiffs contend that the public interest cited here—drug interdiction—is not a "special need" that checkpoints may be used to target.

Unfortunately for Plaintiffs, the Supreme Court in *Sitz*, 496 U.S. at 451, 110 S.Ct. 2481, has previously rejected this analysis, holding that the "special needs" requirement set forth in *Von Raab* and *Skinner*[7] does not apply to "cases dealing with police stops of motorists on public highways." *Id.* at 496 U.S., at 450, 110 S.Ct., at 2485. Instead, the Court directed that the reasonableness of a seizure of a motorist on a public highway without individualized suspicion be determined solely on the basis of the *Brown* balancing test. *Id.* Therefore, consistent with *Sitz*, we evaluate the constitutionality of the checkpoints before us by applying the *Brown* balancing test.

### B) APPLYING THE BROWN BALANCING TEST

#### 1) GOVERNMENT'S INTEREST

The government's interest in interdicting narcotics is beyond serious dispute. The narcotics industry is "one of the greatest problems affecting the health and welfare of our population," *Treasury Employees v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989), and has created a "veritable national crisis in law enforcement." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985). We need not dwell further on this issue.

■ The more significant issue is whether the checkpoints in controversy here are effective in addressing the drug problem. We do not attempt to determine, however, whether the use of checkpoints is the most effective means of achieving the government's objectives, or even whether it is more or less effective than other means. It is not for the courts to decide "which among reasonable alternative law enforcement techniques should be employed.... [F]or purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Sitz*, 496 U.S. at 453–54, 110 S.Ct. at 2487. The courts must decide only whether, when evaluated against the importance of the governmental interest and the degree of intrusion, the checkpoints are at least reasonably effective as a tool for advancing the government's interest. *Id.*

■ The uncontroverted evidence establishes that the checkpoints in this case have resulted in fifty-five drug related arrests out of a total of 1161 vehicles stopped, representing an effectiveness ra-

---

**7.** Both *Skinner* and *Van Raab* address manda-tory drug testing, not checkpoints.

tio (number of arrests divided by number of vehicles stopped) of approximately 4.7%. (*See* Defendants' Exhibit B.) Although at first blush this figure may appear low, the Supreme Court has approved checkpoints where the effectiveness ratio was 1.6% (*Sitz, supra*—sobriety checkpoint) and 0.5% (*United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)—immigration checkpoint). Relative to these other cases, the checkpoints in the instant case are substantially more effective.

## 2) *LEVEL OF INTRUSION*

Next we address the extent of the intrusion imposed upon the individual motorists subjected to the checkpoints. In making this examination, we consider both the objective and subjective intrusions that the motorists have necessarily encountered. *Sitz,* 496 U.S. at 452, 110 S.Ct. at 2486.

### a) *Subjective Intrusion*

"[T]he critical factors in assessing a checkpoint's 'subjective intrusion' are, first, whether it is set up in a manner which informs incoming motorists that this is an official stop and, secondly, whether it gives the officers conducting the stop unbridled discretion to randomly target individual motorists." *Trevino,* 60 F.3d at 337; *see also Sitz, supra.*

We are told that the individual motorists are informed that the checkpoints are official by virtue of the obvious massive law enforcement presence at each checkpoint, including a large number of uniformed officers with fully marked police vehicles. Additionally, the dates of the checkpoint operations (not their locations) have been released in advance to the public, resulting in media coverage which has increased public awareness of their existence.

Second, and perhaps more importantly with regard to analyzing the degree of subjective intrusion, is the amount of discretion afforded law enforcement officers at the scene. The constitutionality of a checkpoint often turns on officer discretion. *See Sitz, supra; Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116; ·*United States v. Huguenin,* 154 F.3d 547, 557 (6th Cir.1998).

The IPD guidelines restrict the discretion of officers on the scene, but do not eliminate it altogether. For example, the City acknowledges that "[i]n the event a problem occurs which requires a change in the pattern of stopping vehicles, an on scene supervisor will determine what stopping sequence is appropriate and document the change with an appropriate explanation for the change." (Government's Response Brief at 14.) The on-scene supervisor is provided discretion apparently in order to ensure that traffic backups do not create an unconstitutional seizure by virtue of the length of the traffic delay—a valid concern. Although officers at a checkpoint should be vested with the least amount of discretion reasonable under the circumstances, we recognize that some limited discretion is necessary to properly address concerns such as traffic backups or ensnarlments that may inherently accompany the checkpoint process. Here, a supervisor's authority is limited to changing the stopping sequence only when traffic problems occur, not simply on a whim or on some other basis. This is an allowance of minimal discretion and has been afforded only to the on-scene supervisor. It is sufficiently circumscribed to pass constitutional muster. In all other respects, the policy directs that the on-scene officers operate without discretion. Their actions are strictly regulated by the official checkpoint guidelines that have been promulgated by the Chief of Police. Accordingly, we hold that the level of subjective intrusion experienced by motorists stopped at the police checkpoints is minimal.

### b) *Objective Intrusion*

The level of objective intrusion is determined by the duration of the stop itself and the intensity of any questioning and

visual inspection that might attend it. *Sitz,* 496 U.S. at 452, 110 S.Ct. at 2486.

■ The typical stop at the Indianapolis checkpoints lasts approximately 2 to 3 minutes. (*See* Depew Aff. ¶ 5.)[8] As previously discussed, the checkpoints are conducted so as to avoid traffic delays, which could cause a motorist to be detained, that is, "seized" for a duration exceeding constitutional limits.[9] *See Merrett v. Moore,* 58 F.3d 1547, 1552 (11th Cir.1995), *cert. denied,* 519 U.S. 812, 117 S.Ct. 58, 136 L.Ed.2d 21 (1996). As it is, the duration of the stops is consistent with checkpoints approved by the Supreme Court in both *Sitz* and *Martinez–Fuerte.* In those cases, the Court upheld the constitutionality of brief roadblock seizures that lasted about twenty-five seconds at a sobriety checkpoint, (*Sitz,* 496, U.S. at 444–56, 110 S.Ct. at 2483–88), and seizures that lasted 3 to 5 minutes at an immigration checkpoint away from the border. *Martinez–Fuerte,* 428 U.S. at 544–48, 96 S.Ct. at 3077–78.

The questioning and inspection occurring during the checkpoint stops in this case include asking for the motorist's driver's license and vehicle registration and having a narcotics dog sniff the exterior of their vehicle. Though asking for a motorist's license and registration is fairly non intrusive, having a dog sniff the exterior of a motorist's vehicle warrants a closer look. Here, the drug detection dog sniffs only the exterior of the vehicle and is positioned in a place the dog has the right to be, suggesting that the intrusion is similar to that of an officer looking for contraband in plain view. *Cf. Horton v. California,* 496 U.S. 128, 142, 110 S.Ct. 2301, 2311, 110 L.Ed.2d 112 (1990). Indeed, the Seventh

Circuit has held that "[a] sniff test, by a well-trained narcotics detection dog, involves only minimal intrusion into a person's privacy." *United States v. Teslim,* 869 F.2d 316, 323 (7th Cir.1989) (*citing United States v. Place,* 462 U.S. 696, 706–707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983)). Other courts have determined specifically that a narcotics dog's sniff of the exterior of a vehicle does not, in itself, constitute a "search." *See United States v. Seals,* 987 F.2d 1102, 1106 (5th Cir. 1993); *United States v. Rodriguez–Morales,* 929 F.2d 780, 788 (1st Cir.1991); *United States v. Morales–Zamora,* 914 F.2d 200, 205 (10th Cir.1990). The drug detection sniff and the license and registration check together and separately constitute a minimal and thus an acceptable degree of intrusion.

### 3) *CONCLUSION: CHECKPOINTS CONSTITUTIONAL UNDER BROWN BALANCING TEST*

Overall, the checkpoints in controversy are targeted effectively and are limited sufficiently to combat the city's drug crisis with minimal intrusion on motorists. Accordingly, we hold that the checkpoint procedures are constitutional under the *Brown* balancing test.

An examination of the two leading Supreme Court cases on highway roadblocks—*Sitz,* 496 U.S. 444, 110 S.Ct. 2481 (1990) and *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)—reveals strong support for our holding. In *Sitz,* the Court approved the use of sobriety checkpoints where the motivation was the government's "interest in preventing drunk driv-

---

8. Of course, further detention of a particular motorist occurs when officers develops individualized suspicion of wrongdoing.

9. Whether one is "seized" while waiting in traffic to reach the checkpoint and, thus, whether that delay should be considered in assessing the reasonableness of the operation, depends on whether the person reasonably believed he or she was not free to turn around and avoid the checkpoint. *Merrett v. Moore,*

58 F.3d 1547, 1552 (11th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 58, 136 L.Ed.2d 21 (1996). "The clock for assessing the reasonableness of the delay caused by the checkpoint begins to run when a reasonable person would believe he cannot leave the line and avoid the checkpoint." *Id.* (*citing United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

ing." 496 U.S. at 455, 110 S.Ct. 2481. There, the Court simply applied the *Brown* balancing test and determined that the magnitude of the drunk driving problem, coupled with the effectiveness of the checkpoints, outweighed the minimal intrusion on motorists. Other than the shear magnitude of the drunk driving crisis, the Court did not identify any other special or regulatory need to justify the use of checkpoints to combat drunk driving. *Id.*

Similar to the government's strong interest in preventing drunk driving, the narcotics checkpoints in this case are justified by the government's similarly strong interest in preventing drug trafficking. The intrusion on the rights of motorists in this case is no greater than the level of intrusion approved in *Sitz.* If *Sitz* were the only Supreme Court discussion of roadblocks, one might attempt to distinguish sobriety checkpoints from narcotics checkpoints on the basis that sobriety checkpoints relate directly to highway safety. Prior to *Sitz,* however, the Supreme Court in *Martinez–Fuerte* upheld a checkpoint away from the international border to search for illegal aliens, which need obviously had no direct relation to highway safety.

Applying the *Brown* balancing test, the Court in *Martinez–Fuerte* held that routine checkpoint stops were necessary because the flow of illegal aliens cannot be controlled effectively at the border. *Id.* at 556–557, 96 S.Ct. at 3082–3083. The Court concluded that the checkpoint stop to search for illegal aliens was a "quite limited intrusion" on Fourth Amendment interests. *Id.* at 557–558, 96 S.Ct. at 3082–3083.

Like illegal aliens in *Martinez–Fuerte,* the flow of narcotics cannot be effectively stopped at the border or through other conventional law enforcement methods, as expressed by the police department in the case at bar and as evidenced by the continuing drug problem. Indeed, narcotics are easily hidden in an automobile, in that sense posing even greater detection problems than do illegal aliens. Absent the holding in *Sitz,* it might be argued that immigration checkpoints are distinguishable from narcotics checkpoints because immigration checkpoints advance an administrative purpose, not a criminal one. *Sitz,* however, explicitly disposes of that contention, holding that it is permissible for a checkpoint to implicate possible criminal sanctions, i.e. arresting drivers for drunk driving.[10] Together, *Sitz* and *Martinez–Fuerte* make it clear that an otherwise valid checkpoint is not unconstitutional simply because its primary purpose is to interdict narcotics traffic.[11]

Although neither the Supreme Court nor the Seventh Circuit has addressed specifically whether a checkpoint for the official purpose of interdicting drug traffic is permissible under the Fourth Amendment, an examination of the various state and federal cases involving roadblocks whose purpose was, wholly or in part, to interdict narcotics reveals further support for our conclusion that the Indianapolis roadblocks are constitutional. Three categories of narcotics roadblocks emerge from those cases.

First is the narcotics roadblock whose stated purpose is to check motorists' driver's licenses and registrations, but whose actual purpose is to search for narcotics.

**10.** Moreover, as we have noted previously, *Sitz* does not require a "special need."

**11.** Checkpoints have been upheld routinely for other purposes as well. *See, e.g., United States v. Trevino,* 60 F.3d 333 (7th Cir.1995) (upheld checkpoint whose purpose was to detect equipment violations and prevent uninsured and non-licenced motorists from operating on the highways); *United States v. O'Mara,* 963 F.2d 1288, 1291–92 (9th Cir.

1992) (reasonable articulable suspicion not required when police utilized highway roadblock to stop all cars leaving national park in response to report of illegal firearms discharges); *Romo v. Champion,* 46 F.3d 1013, 1020 (10th Cir.1995) (reasonable articulable suspicion not required to stop car at roadblock on public thoroughfare which was only visitor route to prison).

These roadblocks are known as "pretext" roadblocks and often get struck down as unconstitutional. Typically, the problem with pretext roadblocks is that they leave too much discretion in the hands of the officers on the scene because the official guidelines do not cover the actual purpose, to wit, interdicting narcotics. *See United States v. Huguenin,* 154 F.3d 547 (6th Cir.1998) (pretext roadblocks provide too much discretion to officers on the scene); *Garcia v. State,* 853 S.W.2d 157 (Tex.Ct. App.1993) (driver's license checkpoint unconstitutional because it was a subterfuge for more general criminal investigation).

The second category includes narcotics roadblocks whose sole stated and actual purpose is to interdict narcotics. Few cases address this type of roadblock, but typically they are upheld because the official guidelines cover the narcotics purpose, thus limiting officer discretion. *See State v. Damask,* 936 S.W.2d 565 (Missouri 1996). The courts also recognize a compelling public interest in stopping the flow of illicit drugs. *Id.*

The third category includes narcotics roadblocks whose stated and actual purposes include searching for narcotics *and* checking licenses and registrations. These roadblocks are almost always upheld because, even assuming a roadblock for the sole purpose of interdicting narcotics is invalid, another valid reason nevertheless exists for the checkpoint, to wit, license and registration checks. *See Merrett v. Moore,* 58 F.3d 1547 (11th Cir.1995) (holding that a mixed motive roadblock, used primarily to interdict drugs, but also to check driver's licenses and registration, was constitutional) [12]; *State v. Everson,* 474 N.W.2d 695 (N.D.1991) (finding that a safety inspection checkpoint, the primary purpose of which was actually drug interdiction, to be constitutional); *but see Galberth v. United States,* 590 A.2d 990 (D.C.App.1991) (checkpoint for drugs and firearms unconstitutional).

The checkpoints in this case fall in the third category. They obviously are not "pretext" roadblocks since interdicting narcotics is one of their official purposes. In fact, both Defendants and Plaintiffs stress the primary purpose of the roadblocks as the interdiction of narcotics, suggesting that the checkpoints fall into the second category. However, a secondary purpose of the checkpoints is to check driver's licenses and vehicle registrations; thus, the checkpoints are more appropriately considered in category three. This distinction is important when considering the cases upon which Plaintiffs rely.

Plaintiffs cite the Sixth Circuit's recent decision in *United States v. Huguenin,* 154 F.3d 547 (6th Cir.1998), in which a narcotics checkpoint was declared unconstitutional. In that case, the police set up a checkpoint whose official purpose was to review driver's licenses and registrations. The court, however, finding that the actual purpose of the checkpoint was to search for drugs, went on to hold that the checkpoint violated the Fourth Amendment because:

> The evidence indicates that when the purpose of a checkpoint is pretextual, the guidelines set up for its ostensible operation are not truthful and are not followed, and too large a degree of discretion is left to the officer in the field on the operation of the subterfuge.

*Id.* at 557.

The Sixth Circuit in *Huguenin* was obviously concerned about the amount of discretion given officers on the scene, since there were no guidelines governing their search for narcotics. That concern does not afflict the policies in the instant case, however. The IPD has made it clear that the purpose for its checkpoints is to interdict narcotics traffic and, accordingly, has structured the official checkpoint guidelines, which minimize officer discretion,

---

12. The Eleventh Circuit in *Merrett* noted that "[n]o question is presented about whether a state can lawfully conduct a roadblock solely to intercept illegal drugs; and we leave that question open." *Id.* at 1551 n. 3.

around that purpose. Thus, *Huguenin* is inapplicable to the instant case.

Plaintiffs also cite *United States v. Morales–Zamora,* 974 F.2d 149 (10th Cir.1992), in support of their position. Like *Huguenin,* the checkpoint in *Morales–Zamora* was ostensibly set up to check licenses and registrations. At trial, it was established that the actual and undisclosed purpose of the checkpoint was to interdict drug traffic, which became the issue on appeal. The legality of a checkpoint for narcotics was not raised since the government conceded that "under the Fourth Amendment it could not set up a roadblock for the sole purpose of subjecting all the stopped vehicles to a canine sniff of the exterior of the car." *Id.* at 151. The Tenth Circuit concluded that the purpose of the checkpoint was to search for narcotics and, given the government's concession, held the checkpoint unconstitutional.

*Morales–Zamora* does not help Plaintiffs. The Tenth Circuit did not analyze the question of whether the narcotics checkpoint was constitutional because the government had conceded that such a checkpoint would violate the Fourth Amendment. Accordingly, once the court determined that the checkpoint was a pretext for narcotics interdiction, it concluded without further discussion that the checkpoint was unconstitutional. In addition, the narcotics purpose in *Morales–Zamora* was secondary to the license/registration check, rather than being the official policy, unlike the instant case where the checkpoints' official purpose is to interdict drug traffickers and where the official guidelines limit officer's discretion in pursuing that goal.[13] In short, *Morales–Zamora* is distinguishable from the instant case based on differing factual and legal circumstances.

Accordingly, based on the *Brown* balancing test and consistent with the relevant case law, the IPD checkpoints pass constitutional muster and Plaintiffs' Motion for Preliminary Injunction must be and is *DENIED.* This ruling should not be construed as a judicial abandonment of the Fourth Amendment, by which courts permit any stop-and-search procedure which is instituted by law enforcement and is justified by the compelling circumstances our country faces in waging a war against drugs. We approve Defendants' use of checkpoints for drug interdiction, but only because the policy under which they are effected is sufficiently non-intrusive to justify their use. To be sure, a motorist's right to be free from unreasonable searches and seizures must not be trivialized or cavalierly sacrificed. Police actions must comport fully with Fourth Amendment standards, and when they do, they deserve to be upheld.

## C) *INDIANA CONSTITUTION CLAIM*

Plaintiffs allege in their Complaint that, in addition to their shortcomings under the United States Constitution, the checkpoints also violate the Indiana Constitution's prohibition against unreasonable searches and seizures under Article 1, Section 11. Plaintiffs do not explicate this position in their Motion for Preliminary Injunction, relying only on a passing mention at the conclusion of their Reply Brief. This inadequate discussion undermines Plaintiffs' ability to establish its likelihood of succeeding on the merits of this claim.

The Indiana Supreme Court has frequently noted that "[s]eparate and apart from the federal Fourth Amendment analysis, the Indiana Constitution provides an independent prohibition against unreasonable searches and seizures under Article 1, Section 11." *Ben–Yisrayl v. State,* 690 N.E.2d 1141, 1152 (Ind.1997); *see also Moran v. State,* 644 N.E.2d 536, 540 (Ind. 1994); *State v. Lamar,* 680 N.E.2d 540,

---

**13.** *See United States v. Galindo–Gonzales,* 142 F.3d 1217 (10th Cir.1998) (suggesting that a pretextual checkpoint for the actual purpose of searching for illegal aliens would be unconstitutional, even though it would be permissible if its *official* purpose were to search for illegal aliens).

543 (Ind.Ct.App.1997). To date, however, the Indiana courts have not had occasion to address whether a checkpoint for the purpose of searching for narcotics is valid under the Indiana Constitution. *See State v. Garcia,* 500 N.E.2d 158 (Ind.1986) (upheld sobriety checkpoint under the Fourth Amendment, but did not address Indiana Constitution); *Covert v. State,* 612 N.E.2d 592 (Ind.App.1993) (same). We decline Plaintiffs' invitation to attempt to answer this question on the limited and one-sided briefing now before us. Any, in any event, should today's ruling on Plaintiffs' federal claim become our final ruling on injunctive relief, we would, in all likelihood, determine that in the interests of judicial economy, convenience, fairness and comity, it is appropriate to relinquish our pendent jurisdiction over Plaintiffs' state law claim, per *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349–351, 108 S.Ct. 614, 618–619 n. 7, 98 L.Ed.2d 720 (1988) and *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Accordingly, Plaintiffs' Motion for Preliminary Injunction based on the Indiana Constitution is *DENIED.*

### IV. *CONCLUSION*

For all the aforereferenced reasons, Plaintiffs' Motion for Class Certification is *GRANTED.* However, Plaintiffs' Motion for Preliminary Injunction is *DENIED* because Defendants' policy and use of drug interdiction checkpoints do not violate the Fourth Amendment. Plaintiffs' claim under the Indiana Constitution is also *DENIED* based on their failure to establish a likelihood of success on its merits.